COBB, Justice,
dissenting:
¶ 33. I respectfully dissent. In my opinion, the trial court exceeded its authority in this case.
¶ 34. Three times Elizabeth Stoner has utilized the rather convoluted initiative process[3] to provide the electorate of this State an opportunity to vote on whether for-profit gaming or gambling should be prohibited in Mississippi. Each time she accepted guidance from the appropriate *405 state officials involved in the process and made adjustments in her documents accordingly. Although only proposed Initiative 20 is before this Court today, the record reflects Stoner’s good faith efforts to follow the recommendations of the Attorney General and to comply with the laws governing the initiative process.
¶ 35. The Legislature obviously did not make the initiative process an easy one, and that is as it should be. However, neither did it make the process impossible to accomplish, and certainly it did not vest any authority in any court to determine at the outset, before the initiative is even put before the voters, that a proposed initiative measure, with only a ballot title and summary, is unconstitutional.
¶ 36. “Initiative”, as defined in Black’s Law Dictionary 788 (7th ed.1999), is “[a]n electoral process by which a percentage of voters can propose legislation and compel a vote on it by the legislature or by the full electorate.” (emphasis added).[4] However, in general discussion, the majority opinion, and occasionally in the statutes themselves, the term “initiative” is often used to mean the actual proposed amendment itself, which is technically called the initiative “measure.” See Miss.Code Ann. § 23-17-1(1) (Supp.1999).
¶37. A careful reading of the entire Chapter 17 of Title 23 (Elections) of the Mississippi Code, reveals no mention of any person or entity having any control over the content of the proposed initiative measure itself. Section 23-17-5 does provide, however, that the Attorney General shall:
review the proposal for matters of form and style, and such matters of substantive import as may be agreeable to the person filing the proposed measure, and shall recommend such revision or alteration of the measure as may be deemed necessary and appropriate. The recommendations of the Attorney General shall be advisory only, and the person filing the proposed measure may accept or reject them in whole or in part.
(emphasis added). The record reflects that Stoner changed her proposed initiative measures each time, in response to the Attorney General’s recommended changes.
¶ 38. Further, pursuant to Section 23-17-9, the Attorney General shall also formulate and transmit a summary of the measure to the Secretary of State, together with a concise statement giving a true and impartial statement of the purpose of the measure, which shall constitute the ballot title. The Secretary of State then shall forthwith notify the person proposing the measure of the exact language of the ballot title and shall publish the ballot title and summary in newspapers of general circulation throughout the State of Mississippi.
¶ 39. The statutory provision which led to the filing of the present case states that if any person is dissatisfied with the ballot title or summary formulated by the Attorney General, he or she may appeal to the Circuit Court of the First Judicial District of Hinds County by petition setting forth “his or her objections to the ballot title or summary and requesting amendment of the title or summary by the court,” pursuant to Section 23-17-13, and
the court shall accord first priority to examining the proposed measure, the title and summary prepared by the Attorney General and the objections to that title or summary. The court may hear arguments, and, within ten (10) days shall render its decision and file with the Secretary of State a certified copy of such ballot title or summary as it determines will meet the requirements of Section 23-17-9.
(emphasis added). No authority is given the circuit court to determine anything *406 other than whether the ballot title or summary meets the requirements of Section 23-17-9.
¶ 40. Stoner is correct in her argument that a proposed initiative measure is not subject to substantive review by the court. The majority initially seems to agree, citing Power v. Ratliff, 112 Miss. 88, 72 So. 864 (1916) for the proposition that “[i]t is true that proposed initiatives will not be reviewed by this or any other court for their wisdom and merit.” However, without explanation, the majority then ignores the holding in Power, in which several citizens sought an injunction against the secretary of state to restrain him from acting upon petitions filed pursuant to an initiative. The trial court granted the injunction, but this Court reversed, stating “[i]t is well settled that courts cannot interfere with the Legislature in the enactment of a void statute or with a municipal corporation in the mere enactment of a void ordinance.... ” “[T]he qualified electors are now undertaking to act in pursuance of this authority (initiative and referendum), and in attempting to December 18, 2000 have the laws in question referred to their vote they are at least attempting the performance of a legislative act, and the courts have no more right to interfere with this legislative act of the people than they have to prevent an abortive attempt of the Legislature to pass a law .... the courts have nothing to do with the making [of the laws], but must deal altogether with the finished product.” Id, 72 So. at 867.
¶ 41. In other states where, like Mississippi, judicial review of the merits and/or substance of an initiative is not prescribed by the constitution or statute, the highest state courts have consistently held that judicial review of the merits is a non-justiciable question. Alaska, Arizona, Colorado, Idaho, Oregon, and Washington all have held that pre-election review of the merits of an initiative to amend their constitutions is barred by the separation of powers doctrine. See, e.g., Brooks v. Wright, 971 P.2d 1025, 1027 (Alaska 1999) (“[gjeneral contentions that the provisions of an initiative are unconstitutional are justiciable only after the initiative has been enacted by the electorate”); Tilson v. Mofford, 153 Ariz. 468, 737 P.2d 1367, 1369 (1987)(en banc) (“Just as under the separation of powers doctrine the courts are powerless to predetermine the constitutionality of the substance of legislation, so also they are powerless to predetermine the validity of the substance of an initiated measure”); In re Title, Ballot Title, & Submission Clause, 943 P.2d 897, 900 (Colo.1997) (en banc) (“We do not address the merits of a proposed initiative, nor do we interpret its language or predict its application if adopted by the electorate”) (citations omitted).
¶ 42. The majority’s vision of “unbridled ballot box chaos” is unfounded. The initiative process has been structured in such a way as to provide many safeguards before a measure is placed on the ballot. The sponsor of an initiative measure not only must obtain signatures of voters equal in number to at least 12% of the votes cast for gubernatorial candidates in the last general election, but also must pay for the printing of petitions, pay a $500 administrative fee to the Secretary of State, and then must take the proposal to the Legislature to seek enactment. The Legislature may adopt, amend, reject or take no action at all with regard to the initiative measure, and then the initiative is placed on the ballot for the next statewide general election.
¶ 43. I respectfully disagree with the majority’s conclusion that the Hinds County Circuit Court is the proper venue and has jurisdiction to review the facial constitutionality of proposed initiatives.
¶ 44. I also respectfully disagree with the majority’s conclusion that Stoner’s revenue impact statement is patently unreasonable.
¶ 45. The statutory and constitutional revenue impact statement requirements are general, not specific. At best, a citizen *407 proposing an initiative measure can only speculate or estimate what the impact will be and which program will be affected. Further, the statute and constitution do not say “[i]f the initiative results in a reduction in any source of revenue ...” but rather say “[i]f the initiative requires a reduction....” Technically, Stoner’s proposed initiative requires only the prohibition of gambling, not a reduction in any source of revenue. That is not to say that a reduction of revenue may not occur.
¶46. Miss.Code Ann. § 23-17-1(3) requires that:
(3) The sponsor of an initiative shall identify in the text of the initiative the amount and source of revenue required to implement the initiative. If the initiative requires a reduction in any source of government revenue, or a reallocation of funding from currently funded programs, the sponsor shall identify in the text of the initiative the program or programs whose funding must be reduced or eliminated to implement the initiative.
¶ 47. Stoner’s revenue impact statement, which she changed to reflect recommendations made by the Attorney General, reads as follows:
(4) Implementation of this initiative will require $1,000,000 in revenue. The source of revenue which will cover implementation cost of the initiative will be derived from the budget of the Mississippi Gaming Commission.
(5) This initiative requires no reduction in any source of government revenue, nor a reallocation of funding from currently funded programs. While the Attorney General has opined that the initiative may result in a loss of government revenue, any indirect loss of revenue will be more than offset by the savings resulting from elimination of the severe negative social and economic effects of gambling. The only program whose funding must be reduced or eliminated to implement this initiative would be the Mississippi Gaming Commission.
(emphasis in original).
¶ 48. While one might disagree with Stoner’s position, the public debate of the cost/benefit analysis of gambling has provided support for her position. One comprehensive review of the impact of casino gambling in Mississippi presents the negative as well as positive aspects of the industry. Ronald J. Rychlak, The Introduction of Casino Gambling: Public Policy and the Law, 64 Miss. L.J. 291 (1995). Acknowledging that “it is quite difficult to evaluate the impact that the gaming industry has had on Mississippi,” Id. at 293, the article addresses not only the negative economic impacts on local businesses (e.g. closing of local “mom and pop” establishments, labor shortages, and high prices of materials) but also social issues, stating: “There are at least five important non-economic impacts that the state must carefully consider when setting policy: the impact on people prone to compulsive behavior, the impact on children, the impact on poor people, the impact on crime and the impact on the environment. Failure to pay special attention to these matters may ‘generate social costs exceeding benefits.’ ” Id. at 333. (footnotes omitted).
¶ 49. Miss.Code Ann. § 23-17-31(2) requires that “[t]he chief legislative budget officer shall prepare a fiscal analysis of each initiative and each legislative alternative. A summary of each fiscal analysis shall appear on the ballot.” Thus, the revenue impact statement required under Miss.Code Ann. Section 23-17-1(3) and Section 273 of the Mississippi Constitution, need only be a general statement creating an awareness of the possible impact. Contrary to the concerns of the majority, the revenue impact statement provided by a proponent of an initiative is not published on the balltit or elsewhere. Only the official fiscal analysis is published.
¶ 50. Since I would reverse and remand because the circuit court exceeded its authority, it is not necessary to address the *408 remainder of the circuit court’s order in detail. However, it was error to hold that Stoner was barred pursuant to the doctrine of res judicata and/or collateral es-toppel. The court’s finding that the instant proposed initiative measure No. 20 is “in all pertinent respects identical” to Stoner’s prior initiative measures No. 12 and No. 13 is simply incorrect. Measure No. 20 clearly addressed the recommendations of the Attorney General and included revenue impact statements which were missing in the first two initiatives.
¶ 51. I would reverse and remand to the circuit court to address the only issue which is properly before that court: whether the ballot title and summary formulated by the Attorney General meet the requirements of Section 23-17-9. Upon that determination, Stoner should be allowed to continue the long journey and to jump the many hurdles which still lie ahead in her effort to get the initiative measure on the ballot.
SMITH, J., JOINS THIS OPINION.

. Tn 1992, the Legislature enacted Miss.Code Ann. §§ 23-17-1 et seq. (Supp.1999), which established a multi-level, multi-step petition process permitting the voters of Mississippi to amend the Constitution by voter initiative. That same year, companion legislation was passed, and later ratified by the electorate, to amend Section 273 of the Mississippi Constitution to comport with the statutory scheme. Prior to these enactments, the citizens' power to initiate constitutional amendments had lain dormant since this Court in 1922 found a prior initiative and referendum amendment was "unconstitutional and void.” Power v. Robertson, 130 Miss. 188, 230-31, 93 So. 769, 775-77 (1922).

. The initiative process in Mississippi, however, is limited to initiating proposed amendments to the Constitution of this State, and does not include initiating legislation. See Miss.Code Ann. § 23-17-1(2) (Supp.1999).